**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHELE BERGERON,**

                                        **Plaintiff,**

           **vs.**                                          **09-CV-1219**
                                                            **(MAD)**

**MICHAEL ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

Albany Law School Clinic                 Joseph M. Connors, Esq.
80 New Scotland Avenue
Albany, New York 12208
_Attorneys for Plaintiff_

Social Security Administration           Andreea L. Lechleitner, Esq.
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorney for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**


### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Plaintiff Michele Bergeron brings the above-captioned action pursuant to 42 U.S.C. §

405(g) and § 1381 of the Social Security Act, seeking a review of the Commissioner of Social

Security's decision to deny her application for disability insurance benefits ("DIB") and

supplemental social security income ("SSI").

## BACKGROUND

On August 31, 2006, plaintiff filed an application for DIB. (T. 102).[1]  On September 7, 2006, plaintiff filed an application for SSI. (T. 108).  Plaintiff was 45 years old at the time of the applications with past work experience as a corrections officer (18 years) and a day care provider. (T. 23, 31, 128, 135).  From 1978 to 1993, plaintiff was in the Army/Army Reserve and was stationed for four years in Germany. (T. 192-209).  Plaintiff's period of alleged disability began on August 24, 2006 and ended on August 27, 2007, when she began working at the Salvation Army Homeless Shelter.  During that year, plaintiff claims that she was disabled due to AIDS, depression, anxiety, carpal tunnel syndrome, and arm/shoulder/hand and leg/hip/knee impairments.

On February 7, 2007, plaintiff's applications were denied and plaintiff requested a hearing by an ALJ which was held on October 1, 2008.  (T. 17, 52-57).  On November 26, 2008, the ALJ issued a decision denying plaintiff's claim for disability benefits.  (T. 8-16).  The Appeals Council denied plaintiff's request for review on September 2, 2009, making the ALJ's decision the final determination of the Commissioner. (T. 1-4).  This action followed.

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than

---

[1] "(T.)" refers to pages of the Administrative Transcript, Dkt. No. 7.

12 months." 42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

On November 26, 2008, the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since August 24, 2006.  (T. 10).  At step two, the ALJ concluded that plaintiff suffered from HIV infection which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations").  (T. 10).  At the third step of the analysis, the ALJ determined that plaintiff's impairment did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 11).  The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "perform the full range of sedentary work".  (T. 12).

At step four, the ALJ concluded that plaintiff did not have the residual functional capacity to perform any of her past relevant work.  (T. 15).  At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy.  (T. 15).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 16).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the Commissioner erred by failing to make any findings regarding whether plaintiff's leg and arm impairments were "severe impairments"; (2) the Commissioner erred in finding that plaintiff's depression was not a "severe impairment"; (3) the ALJ committed reversible error by not assessing Listing 14.08N; (4) the ALJ erroneously failed to make any specific findings concerning plaintiff's physical and mental residual capacity; and (5) the ALJ should have elicited testimony from a vocational expert. (Dkt. No. 14).

## I.      ALJ's Assessment of Plaintiff's Leg and Arm Impairments at Step 2

Plaintiff argues that the ALJ misapplied the relevant law in assessing the severity of her leg and arm impairments at the second step of the sequential evaluation.  The Commissioner asserts that the ALJ evaluated the evidence and reasonably found that plaintiff did not have severe musculoskeletal impairments.

A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities.  *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); see also Social Security Ruling 85-28, 1985 WL 56856, at *3-4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).

Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C.F.R. § 404.1520 (c). The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir.1995). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe. *McConnell v. Astrue*, 2008 WL 833968, at *2 (N.D.N.Y. 2008) (citing *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995)). A condition that improves and is repairable may not be considered a disability for purposes of disability benefits. *See Pennay v. Astrue*, 2008 WL 4069114, at *4 (N.D.N.Y. 2008).

## A.    Medical Evidence

### Right Shoulder

In September 1997, plaintiff was evaluated at the Work Assessment and Conditioning Center of Eastern New York by Michele McTague, P.T. for right shoulder pain. (T. 217). Ms. McTague noted that plaintiff injured her right shoulder in August 1995 and re-injured her shoulder in February and October 1996. Ms. McTague recommended that plaintiff receive physical therapy three times a week. On October 7, 1997, plaintiff was discharged from physical

therapy after completing five sessions.  Plaintiff was unable to continue due to personal problems.  (T. 215-233).

On November 6, 1998, plaintiff was treated by Dr. Richard J. D'Ascoli at Regional Orthopedics.[2]  Dr. D'Ascoli noted that plaintiff's "shoulder is doing reasonably well" and that, "the only thing she is unable to do is to pass her military physical just yet because she has to be able to do 25 pushups, and she can only do approximately 15 or so because of discomfort here".  (T. 244).  Plaintiff complained of pain after using the extremity for excessive periods of time, but "generally feels fairly good with it".  Upon examination, plaintiff exhibited good range of motion with a bit of weakness but no muscle spasm.

On July 22, 2002, plaintiff was seen at the St. Claire's Emergency Room complaining of right shoulder pain.  (T. 231).  Plaintiff was diagnosed with right rotator cuff tendinitis.  Plaintiff followed with Dr. D'Ascoli on July 31, 2002.  The doctor noted that plaintiff had been out of work since the 22nd and prescribed physical therapy.  (T. 240).  On August 5, 2002, plaintiff was evaluated at John Mack Physical Therapy.   (T. 245-249).  On September 30, 2002, plaintiff had a follow up visit for her right shoulder with Dr. D'Ascoli.  (T. 240). Plaintiff had continued pain due to irritants at work.  The doctor advised that if her pain did not resolve that she would need to consider injections and/or an MRI.  On October 17, 2002, plaintiff was discharged from physical therapy after nine inconsistent visits due to lack of follow up.

On May 1, 2003, plaintiff was treated at the Ellis Hospital Emergency room complaining of right shoulder pain after an altercation at work.  (T. 233).  She also complained of numbness and tingling in her right hand.  X-rays were negative.  Plaintiff was diagnosed with a right

---

[2] The record contains Dr. D'Ascoli's treatment records from November 1998 through May 2003.  While the November 1998 visit is the first treatment note, the record reads, " Michele is seen her [sic] for her final visit to close out her case". (T. 244).

shoulder strain and prescribed Vicodin.  On May 7, 2003, plaintiff had a follow up visit at

Regional Orthopedics.  During the examination, the doctor, Dr. G. Robert Cooley, noted that

plaintiff had "near full range of motion" and no swelling.  Dr. D'Ascoli diagnosed plaintiff with a

right shoulder strain and advised her to return to work on May 12, 2003.  (T. 239).

On September 14, 2006, plaintiff presented at the VA Medical Center in Albany with "a

new complaint of right shoulder pain".[3] (T. 254).   Nurse Shaw noted that plaintiff's pain was

only noticeable when she moved her arm in the forward position and there was no swelling

present.  Plaintiff was prescribed Ibuprofen and advised to apply heat.

**Right Knee**

On November 15, 1999, plaintiff was treated at the emergency room at St. Claire's

Hospital for complaints of knee pain after "missing a step" and "twisting her knee" .  The x-rays

were negative and plaintiff was treated with ice, Motrin, a soft bandage and crutches.  On

November 16, 1999, plaintiff returned to Regional Orthopedics for complaints of knee pain.

Plaintiff was treated by Glenn Jones, RPA.  (T. 244).  Upon examination, RPA Jones noted

tenderness and swelling.  Plaintiff was advised to continue her course of treatment and return if

the pain continued.  (T. 244).   On November 23, 1999, plaintiff returned with continued

complaints of right knee pain.  Upon examination, RPA Jones noted effusion and that plaintiff

was unable to weight bear even with crutches.  (T. 243).  An MRI scan was ordered.

On December 7, 1999, plaintiff had an MRI of her right knee at St. Claire's Hospital.   On

December 14, 1999, Dr. D'Ascoli examined plaintiff and reviewed the films and found a "bucket

handle medial meniscus tear".  Since plaintiff was still symptomatic, she elected to proceed with

arthroscopic surgery.  (T. 243).  On January 6, 2000, plaintiff underwent surgery at St. Claire's.

---

[3]  In October 2005, plaintiff began treating at the VA Medical Center in Albany.  On September 14, 2006,
she was treated by Nurse Practitioner Judy Shaw in the Infectious Disease Department.

(T. 227).  Her post-operative diagnosis was a right medial meniscus tear.  Plaintiff's follow up visits were normal and her range of motion was noted as "good".

### Right Wrist

On March 14, 2002, plaintiff returned to Regional Orthopedics complaining of right wrist pain.  (T. 242).  RPA Jones noted that plaintiff "has had carpal tunnel for some time" without treatment.  Upon examination, plaintiff exhibited good range of motion without pain.   X-rays were negative and Dr. D'Ascoli ordered EMG nerve conduction studies.  On May 7, 2002, plaintiff returned for a follow-up visit.  At that time, Dr. D'Ascoli noted that the EMG scans were negative but suggested that plaintiff consider injections.  Plaintiff opted to exercise. (T. 240).

On December 3, 2002, plaintiff returned to Dr. D'Ascoli complaining of right wrist pain.  The doctor noted that plaintiff could have a ganglion cyst but that x-rays were negative.[4]   (T. 240).

### Orthopedic Consultative Examination

On October 30, 2006, plaintiff was examined by Amelita Balagtas, M.D., at the request of the agency. (T. 284).  Plaintiff complained of right shoulder and hip pain.  Upon examination, Dr. Balagtas noted that plaintiff had a full range of motion in her shoulders and hips. (T. 285-286).  Dr. Balagtas diagnosed plaintiff with right hip and shoulder pain and opined that plaintiff would have slight to moderate limitations in activities that require bending, lifting, prolonged sitting, standing, walking, lifting, carrying and reaching involving the right upper extremity. (T. 286).

---

[4] A ganglion cyst is a noncancerous fluid-filled lump formed on the elbow, knee, foot, shoulder, wrist, toe or finger.  *Dorland's Illustrated Medical Dictionary,* 768 (31st ed. 2007).

**B.      Analysis**

At step two, the ALJ failed to make any findings relating to plaintiff's arm/shoulder/hand

or leg/hip/knee pain.[5]  However, it is clear from the decision that the ALJ found these

impairments to be "non-severe".  The ALJ discussed plaintiff's joint pain and viewed the

evidence "in a light most favorable to claimant" in his analysis of plaintiff's RFC:

> [p]hysical examinations have been essentially normal.  X-rays were
> consistently within normal limits.  She had complaints of some hip
> pain, but the examination was described as normal.  There was little
> in the way of treatment of her musculoskeletal complaints.

(T. 13).

Upon review of the record, the Court finds that the ALJ's conclusion is supported by

substantial evidence.  The Administrative Transcript does not contain any assessments from any

treating source or physician regarding plaintiff's alleged musculoskeletal impairments and how

those impairments affect her ability to perform work-related activities.  Moreover, all of

plaintiff's treatment relating to her knee and wrist predated the closed period of disability.

Plaintiff treated sporadically for shoulder pain from 1997 through 2003.  Moreover, from 2003

until 2006, the record contains no evidence related to any complaints of shoulder pain.  During

the period of alleged disability, plaintiff had only one examination relating to her shoulder.

Similarly, plaintiff made no complaints of knee pain after her surgery in 2000 and no complaints

relating to her wrist after 2002.  All radiological films and scans, with the exception of the MRI of

plaintiff's knee, were normal.  After plaintiff's knee surgery, Dr. D'Ascoli noted that plaintiff

was, "doing very well.  She has a minimal effusion and her wounds are healed nicely and there is

---

[5] Plaintiff claims that she suffers from various musculoskeletal complaints.  However, the record only
contains complaints and treatment relating to her right shoulder, right wrist and right knee. As to plaintiff's hip pain,
bone density scans taken in August 2006 were normal.  (T. 251-253).

no evidence of [ ] infection". (T. 242). On January 20, 2000, Dr. D'Ascoli note that plaintiff's motion was good and that she was going back to full duty on February 1, 2000. (T. 242).

In support of her argument, plaintiff cites to the Northern District decision in *Ebert v. Astrue*, 2009 WL 3764219 (N.D.N.Y. 2009). The Court has reviewed *Ebert* and finds the factual scenario in this matter to be distinguishable. In *Ebert*, the plaintiff provided extensive testimony regarding the debilitating affects of headaches and her efforts to combat the pain with prescription medication and the use of ice and hot packs. *Id*. at *8. Further, the vocational expert testified that the plaintiff's migraines would affect her ability to work. *Id.* Accordingly, the Court found that the ALJ minimized the frequency and affects of the plaintiff's headaches. *Id*. at *8. In this matter, the record does not include such evidence. Indeed, during the hearing, plaintiff testified vaguely about "joint pain" in her "body", "knee" and "ankle" but never addressed or discussed any limitations relating to her shoulder, wrist or knee. (T. 27). Rather, plaintiff testified that her inability to work was due to depression, fatigue and the symptoms from AIDS. (T. 40); *see McConnell*, 2008 WL 833968, at *14 (at her hearing, the plaintiff mentioned several ailments when prompted to discuss any medical conditions that caused her pain but never brought her knee injury to light).

Any error by the ALJ in failing to address these impairments at step two was harmless because the ALJ proceeded beyond step two and considered all of plaintiff's impairments including her musculoskeletal complaints. *See Kemp v. Comm'r of Soc. Sec.*, 2011 WL 3876526, at *8 (N.D.N.Y. 2011).

Given the lack of medical evidence and subjective testimony regarding plaintiff's limitations, the Court finds that substantial evidence exists to support the ALJ's determination regarding the severity of plaintiff's shoulder, knee and wrist impairments.

**II.     ALJ's Assessment of Plaintiff's Depression at Step Two**

Plaintiff argues that the ALJ erred in concluding that plaintiff's depression was not a severe impairment.  Plaintiff contends that the ALJ misapplied the Treating Physician Rule and misconstrued the evidence regarding her activities of daily living.

The Regulations require the ALJ to utilize a "special technique" at each step of the administrative review process when a claimant suffers from a mental impairment.  *Rosado v. Barnhart*, 290 F.Supp.2d 431, 437 (S.D.N.Y. 2003) (citations omitted); 20 C.F.R. §§ 404.1520a(a); 416.920a(a).  First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental impairment."  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also Dudelson v. Barnhart*, 2005 WL 2249771, at *12 (S.D.N.Y. 2005).  If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment [ ]."  20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).  The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not severe "unless

11

the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

A diagnosis of depression, without more, does not suggest that a plaintiff's depression severely impairs her performance of any major life activity.  *See Torres v. Astrue*, 550 F.Supp.2d 404, 411 (W.D.N.Y. 2008).  The medical evidence must show that depression precludes a plaintiff from performing basic mental work activities.  *See Snyder v. Astrue*, 2009 WL 2157139, at *4 (W.D.N.Y. 2009).  Moreover, evidence that medication provides relief from the severity of a mental condition can provide substantial evidence to support a finding that a plaintiff is not disabled.  *Pennay*, 2008 WL 4069114, at *5.

Here, the ALJ discussed the "technique" and the applicable Regulations and found:

> As a result of this impairment, the claimant has no limitation of activities of daily living.  The claimant reported the ability to take care of her personal needs.  She cared for the needs of children.  She shopped for groceries, prepared meals, cleaned her home and did the laundry.  There is, at best, mild limitation in maintaining social functioning.  The claimant admitted to the ability to take public transportation and go to the grocery store.  She was involved in community events and attended church.  (T.).

## A.    Medical Evidence

On October 14, 2005, plaintiff was evaluated as a new patient at the VA Medical Center in Albany.  (T. 274).  Dr. Devorah Wasserman noted that plaintiff suffered from anxiety and depression and referred plaintiff for a consultation with the Behavioral Health Department.  On October 25, 2005, Sheryl Fowler, a social worker, examined plaintiff and noted that she suffered from depression as a result of work-related stressors and a history of "severe abuse".  (T. 270). On October 28, 2005, Dr. William Cox, a psychiatrist, evaluated plaintiff for complaints of insomnia and anxiety.  (T. 266).  Dr. Cox noted that plaintiff suffered from stress due to her job

and finances and diagnosed plaintiff with adjustment disorder and a GAF of 60.  Dr. Cox

prescribed Trazodone for insomnia.[6]  On November 1, 2005, plaintiff returned to Ms. Fowler

complaining of "ongoing tension" with her job.   Plaintiff noted that her family was "stable".  Ms.

Fowler advised plaintiff to continue with her medications and attend supportive sessions. (T.

266).  On January 13, 2006, plaintiff was a "no show" for her appointment with Dr. Cox.  On

March 2, 2006, plaintiff was seen by Nurse Practitioner Judy Shaw in the Infectious Disease unit.

(T. 261).  NP Shaw noted that plaintiff was "no longer seeing mental health and feels stable".  NP

Shaw advised plaintiff to continue taking Trazodone but noted that plaintiff was, "much better".

On August 29, 2006, plaintiff was examined by Dr. Cynthia Carlyn in the Infectious Disease unit.

Dr. Carlyn noted that plaintiff was on leave due to medical and psychological problems.

On September 12, 2006, NP Shaw completed a Medical Report of Adult with Allegation

of HIV.  In that report, NP Shaw opined that plaintiff was, "very anxious, insomnia, joint pain,

depression, wt. loss.  Unable to work."  (T. 278).  NP Shaw also opined that plaintiff had marked

difficulties in completing tasks in a timely manner due to deficiencies in concentration,

persistence and pace.

On October 30, 2006, Dr. Brett Hartman conducted a psychiatric consultative evaluation

of plaintiff at the request the agency.  (T. 279-283).  Plaintiff advised that she was taking

Trazodone and treating with a psychiatrist, "once a month".  Plaintiff complained of insomnia,

anxiety and depression.  Plaintiff claimed that she was irritable, lost interest in activities and had

considerable bouts of diarrhea.  Plaintiff denied suicidal thoughts but was overwhelmed and

"cleans compulsively".  Plaintiff was able to care for her personal needs, cook, clean and shop.

She could manage money but was forgetful so she did not drive.  She was taking two college

---

[6] Trazodone is an antidepressant medication. *Dorland's* at 1336, 2125.

classes and during the day reported watching television, using the computer and going for walks.

Dr. Hartman diagnosed plaintiff with major depressive order, mild to moderate, without psychotic

features.  He opined that she could follow and understand simple instructions; could perform

simple tasks and learn new tasks; could make appropriate decisions; had fair attention and

concentration and the ability to maintain a routine schedule; a fair ability to perform complex

tasks independently; and mild difficulty relating to others and mild problems dealing with normal

stressors.

On December 10, 2006, plaintiff appeared for a routine visit with NP Shaw.  NP Shaw

noted that plaintiff was "happy and bubbly" and "doing very well" and "just happy with

everything she is doing in life". (T. 340).  NP Shaw opined that plaintiff may start to decrease her

dose of Trazodone in the future.  On March 9, 2007, NP Shaw noted plaintiff was "doing very

well".  Plaintiff was taking classes at Schenectady Community College and was "proud that she

was on the Dean's List".  (T. 343).   While plaintiff continued to take Trazodone at night, "she

feels that she is in much better spirits overall since leaving her job.  She feels very fulfilled and

keeps herself busy with, family and school". (T. 344).  NP Shaw noted that plaintiff's depression

was well controlled with medication and her change in lifestyle.

On April 24, 2008, Dr. Carlyn and NP Shaw submitted a letter with their opinion

regarding plaintiff's impairments:

> It is my opinion that Ms. Bergeron has held a steady job for her entire
> life and worked hard to support herself and her family.  The medical
> diagnoses  AIDS/HIV,  Major  Depressive  Disorder,  anxiety
> accompanied by constant symptoms of fatigue, diarrhea, insomnia and
> night sweats all support a finding of Ms. Bergeron to be disabled from
> the time period of August 24, 2006 (disability onset date) until August
> 27, 2007 when she began her current part time job.[7]

---

[7] The April 2008 letter is co-authored by Dr. Carlyn and N.P. Shaw.  The ALJ erroneously referred to "Dr.
Shaw" in the opinion. (T. 14).

(T. 325).

**B.      Treating Physician Rule**

The Second Circuit has defined a treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coty v. Sullivan*, 793 F.Supp. 83, 85-86 (S.D.N.Y. 1992) (quoting *Schisler v. Bowen*, 851 F.2d 43 (2d Cir. 1988)).   Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. 404.1527(d)(2).  The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 501, 503-504 (2d Cir. 1998).  Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  The regulations specify that an ongoing treatment relationship is generally found where an acceptable medical source treats a claimant "with a frequency consistent with accepted medical practice for the type of treatment

and/or evaluation required for [the claimant's] medical condition(s)." *Shatraw v. Astrue*, 2008 WL

4517811, at *11 (N.D.N.Y.  2008) (finding four physicians were not treating sources because they

each only treated the Plaintiff once and therefore did not develop an ongoing treatment

relationship with the Plaintiff). Thus, an acceptable medical source who has treated or evaluated a

claimant only a few times, or only after long intervals, may still be considered a treating source

"if the nature and frequency of the treatment or evaluation is typical for [the] condition(s)." 20

C.F.R. § 404.1502; *see, e.g., Fernandez v. Apfel*, 1998 WL 812591, at *3-4 (E.D.N.Y. 1998)

(finding that a physician the Plaintiff saw six to eight times over the course of one and a half to

two years was not a treating source because the Plaintiff did not see the physician with a

frequency consistent with the severe mental impairment he claimed).  Plaintiff claims that the

ALJ erroneously disregarded opinions from her treating physicians including Dr. William Cox,

Dr. Jeffrey Fisher and Dr. Cynthia Carlyn.  For several reasons, the Court finds this argument to

be without merit.  While plaintiff correctly states that the ALJ did not mention Drs. Cox or Fisher,

the Court can evaluate the treating physicians opinion through a review of the record. *Bavaro v.*

*Astrue*, 413 F. App'x 382, 383 (2d Cir. 2011).  First, Drs. Cox and Fisher did not provide any

opinion or medical source statement regarding plaintiff's alleged functional impairments.

Second,, based upon the record, Drs. Cox and Fisher cannot be considered "treating physicians"

as they examined plaintiff on only one occasion.  The doctors did not provide plaintiff with the

type of ongoing medical treatment that would define them as a "treating physician".  *See George*,

692 F.Supp. at 219 (holding that the nature of the physician's relationship with the plaintiff did

not rise to the level of a treating physician as the physician had only seen the plaintiff on two

occasions); *see also Quinones v. Barnhart,* 2006 WL 2136245, at *7 (S.D.N.Y. 2006) (holding

that the treating physician's opinion was correctly afforded less weight as he only saw the

plaintiff on one occasion).  Moreover, Drs. Cox and Fisher did not treat plaintiff during the

relevant period, rather, each examined plaintiff in 2005, three years before the administrative

hearing and one year before the period of disability at issue.  *See Bavaro,* 413 F. App'x at 384;

*see also Bromback v. Barnhart*, 2004 WL 1687223, at *7 (S.D.N.Y. 2004) (holding that the ALJ

should not have relied on an evaluation that was made one year prior to the hearing).      With

respect to Dr. Carlyn, the ALJ discussed the April 2008 opinion[8]:

> Although Dr. Shaw described "constant" fatigue, diarrhea, insomnia
> and night sweats, the record shows there are occasions where the
> claimant did not report such symptoms, which is inconsistent with the
> physician's statements.    Treatment records document that the
> claimant's HIV was under good control and treatment.  Her CD4
> count was 586.  It was also documented that her depression had
> improved.  She was described as very outgoing and bubbly and happy
> with everything she was doing in life.  In March 2007, it was noted
> that the claimant was doing very well.  She reported that she felt well
> and had gained some weight.  Therefore, the Administrative Law
> Judge accords little weight to this opinion as it was not well supported
> by the objective findings set forth in the record". (T. 14).

Upon review, the Court finds that the ALJ provided sufficient reasons for failing to assign

controlling weight to Dr. Carlyn's opinions.  First, Dr. Carlyn cannot be considered a "treating

physician" as she examined only plaintiff once in 2006.  At the completion of Dr. Carlyn's

August 2006 examination, she suggested that plaintiff continue with her course of treatment for

HIV and discussed gynecological and dental issues with plaintiff.  Dr. Carlyn provided no

opinion, diagnosis or any comment on plaintiff's complaints of depression, anxiety or insomnia

and provided no course of treatment for those complaints.  Accordingly, Dr. Carlyn's April 2008

opinion is not supported by the her treatment records from her one-time examination of plaintiff

nearly two years prior to issuing that opinion

---

[8] The ALJ erroneously referred to Dr. Shaw rather than Dr. Carlyn.

Generally, the ALJ has a duty to develop a deficient record, even if the claimant is represented by counsel. *See Rosa*, 168 F.3d at 179. While the ALJ has a duty to recontact treating physicians to obtain a complete medical history, 20 C.F.R. §§ 404.1212(e)(1), 416. 912(e)(1), the ALJ had no such duty in this matter because Drs. Carlyn, Cox and Fisher were not "treating physicians". Moreover, plaintiff has not identified any gaps in the record for the relevant closed period of disability that would require the ALJ to recontact any physician. *See Spruill v. Astrue*, 2008 WL 4949326, at *4 (S.D.N.Y. 2008) (the record contained the treating physicians treatment notes for the dates that the plaintiff claims she was treated).

For the foregoing reasons, the Court finds that the ALJ properly applied the Treating Physician rule.

## C.     Activities of Daily Living

Plaintiff further claims that the ALJ committed legal error in assessing plaintiff's activities of daily living with respect to her depression. In the decision, the ALJ cited to Dr. Brett Hartman's psychiatric evaluation. Plaintiff claims that the ALJ ignored reports from NP Shaw and Dr. Carlyn and other portions of plaintiff's administrative hearing testimony that contradict Dr. Hartman's report.

As previously discussed, in September 2006, NP Shaw opined that plaintiff had marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence and pace. Further, in April 2008, NP Shaw co-authored a letter with Dr. Carlyn and opined that plaintiff suffered from, *inter alia*, major depressive disorder, anxiety and insomnia.

The ALJ discussed NP Shaw's assessment:

> Judy Shaw, NP, reported that the claimant had repeated manifestations of HIV infection with documented symptoms including fatigue,

18

> weight loss, pain and night sweats.  She noted marked difficulties in
> completing tasks in a timely manner due to deficiencies in
> concentration, persistence or pace.  The claimant was very anxious.
> She had insomnia, joint pain, depression and weight loss.  Shaw
> further concluded that the claimant was unable to work.  Although
> great weight cannot be accorded to the opinion of a nurse practitioner,
> the Administrative Law Judge has given careful consideration to this
> opinion and finds that it is not consistent with the medical evidence as
> a whole.  A review of the claimant's VA progress notes do not reflect
> allegations of difficulties in completing tasks.  As noted above, there
> was very little in the way of treatment records for her alleged mental
> impairment. (T. 14).

Upon a review of the record, the Court finds that the ALJ properly assessed NP Shaw's

opinions and provided adequate reasons for not affording controlling weight to NP Shaw's

conclusions.  As the ALJ correctly noted, NP Shaw was not a treating source subject to the

treating physician rule because a nurse practitioner is not an acceptable medical source.

*Rockwood v. Astrue*, 614 F.Supp.2d 252, 270 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1513(d),

416.913(d) (listing a nurse practitioner as an other source, and not an acceptable medical source)).

 Accordingly, the ALJ was not compelled to afford NP Shaw's opinions controlling weight.

However, even assuming the ALJ assigned significant weight to NP Shaw's September 2006

opinion, that opinion does not support plaintiff's claim that she suffers from limitations in daily

living.  Indeed, in Section 42b of the form completed by NP Shaw, the author is whether

plaintiff's impairments resulted in "marked restriction of activities of daily living; or marked

difficulties in maintaining social functioning; or marked difficulties in completing tasks in a

timely manner due to deficiencies in concentration persistence or pace".  In response to that

inquiry, NP Shaw only checked the box for "marked difficulties in completing tasks in a timely

manner due to deficiencies in concentration persistence or pace".

NP Shaw's opinions are also contradicted by the weight of the credible evidence.  The

only "mental health" impairment for which plaintiff received medication was insomnia.

Additionally, all treatment notes indicate that plaintiff's insomnia was "well controlled". NP Shaw's treatment records describe plaintiff as "bubbly", "happy", "proud to be on the Dean's List", "fulfilled" and "busy with her family and school". (T. 344).

Additionally, plaintiff's subjective testimony is not support by her treatment records. Plaintiff testified that she was depressed due to the fact that she had AIDS and that she had anxiety over whether she would infect other officers or inmates at her job. (T. 24-25). During the closed period, she claimed that she considered taking her own life, she was depressed, guilty and full of shame. (T. 26). Plaintiff also testified that she watched television, walked about two blocks on an average day, cleaned for five to ten minutes, and took on-line college classes. (T. 26). The treatment records from NP Shaw, Dr. Carlyn, Dr. Cox, Sheryl Fowler are completely devoid of any reference to suicidal thoughts or depression. Further, while plaintiff testified to such impairments, the records indicate that plaintiff was on the Dean's List, cleaned "compulsively", cooked, and shopped. (T. 279-283).

Upon review of the record, the Court finds that there is substantial evidence to support the ALJ's decision that plaintiff's depression was a non-severe impairment as it did not prevent her from engaging in substantial gainful activity. Consequently, as substantial evidence supports the ALJ's decision that plaintiff's mental impairments were not medically determinable impairments, the ALJ did not err when he failed to analyze plaintiff's impairments with respect to Paragraph "B" criteria.

## III.     Listing 14.08N

An ALJ faced with an HIV-related disability must evaluate the claimant's allegations under Listings 14.00 (immune system disorders) and 14.08. *Milien v. Astrue*, 2010 WL 5232978,

at *7 (E.D.N.Y. 2010).  Listing 14.08N was amended in June 16, 2008. The new listing, 14.08K,

provides:

> Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A-J, but without the requisite findings for those listings (for example, carcinoma of the cervix not meeting the criteria in 14.08E, diarrhea not meeting the criteria in 14.08I), or other manifestations (for example, oral hairy leukoplakia, myositis, pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance, muscle weakness, cognitive or other mental limitation) resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
>
> 1.  Limitation of activities of daily living.
> 2.  Limitation in maintaining social functioning.
> 3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

*Haddock v. Astrue*, 2009 WL 3162170, at *7 (D.Colo. 2009).  "The listing for HIV at 14.08(N)

clearly states that the HIV infection must result in the symptoms and limitations."  *Id*.  A plaintiff

will not be found "disabled" due to HIV where the accompanying impairments were "isolated

incidents" rather than "chronic" ailments.  *See Roman v. Barnhart*, 477 F.Supp.2d 587, 598

(S.D.N.Y.2007).


**A.     Medical Evidence**

In October 2005, plaintiff sought treatment for HIV at the VA Medical Center in Albany.

Plaintiff believes she contradicted the disease by way of a blood transfusion in 1981 following the

delivery of her child in Germany.  In 1989, while on active duty with the military in Germany,

plaintiff was tested however, she was never informed or treated for the illness.  In December

2005, after undergoing testing and consultations, plaintiff began a course of therapy and treatment

including medication.  In March 2006, plaintiff was treated by NP Shaw after "a couple of missed

appointments". (T. 261).  Plaintiff had gained weight, denied any side effects including rash or vivid dreams and had a good response to her therapy.   During plaintiff's June 2006 follow up, her condition was the same with her CD4 count about 200.  (T. 260).  During her July 2006 appointment, plaintiff denied experiencing any night sweats, headaches or fever. (T. 258).  NP Shaw noted that her HIV "continues to be very well controlled".

On August 26, 2006, plaintiff was treated by Dr. Carlyn with complaints of diarrhea, fatigue, hip pain, shoulder pain and fears and anxiety regarding her illness.  (T. 254).  Plaintiff's T-cell count was in the mid-500 range after being as low as 161.  (T. 256).  Upon examination, Dr. Carlyn noted that plaintiff was, "thin".

On September 12, 2006, NP Shaw completed a Medical Report on Adult with Allegation of HIV Infection. (T. 276).  NP Shaw noted that plaintiff's HIV was diagnosed through laboratory testing and further opined that plaintiff suffered from HIV Wasting Syndrome and diarrhea.[9]  NP Shaw noted that plaintiff experienced night sweats every night for eight hours, diarrhea two to three times a month, three or four times a day and daily fatigue. (T. 278).

On December 8, 2006, plaintiff had a routine visit with NP Shaw.  At that time, plaintiff's CD4 count was 586 and Nurse Shaw noted, "she had good control of her HIV virus again". (T. 340).  Plaintiff denied any side effects from her medication.  NP Shaw noted that plaintiff retired from her position at the Schenectady County jail and was working as a teacher's assistant and taking classes at the community college.

---

[9] The report defined HIV Wasting Syndrome as "involuntary weight loss of 10 percent or more of baseline and, in the absence of a concurrent illness that could explain the findings, involving: chronic diarrhea with 2 or more loose stools daily lasting for 1 month or longer; or chronic weakness and documented fever greater that 100.4 degrees F for the majority of 1 month or longer".  Diarrhea was defined as, "lasting for 1 month or longer, resistant to treatment, and requiring intravenous hydration, intravenous alimentation or tube feeding".  (T. 277).

In March 2007, during a routine visit, NP Shaw noted that plaintiff had gained some weight. (T. 343).  Plaintiff had no physical complaints and while she continued to take Trazodone at night, she felt very fulfilled and in much better spirits.  In May 2007, plaintiff was seen for an "urgent" visit complaining of a cough and low grade fever.  NP Shaw noted, "[e]arlier she also had myalgia, anorexia, and nausea".  Plaintiff's temperature was 99.3 and upon examination, NP Shaw did not detect any oral lesions.  NP Shaw ordered a chest x-ray to rule out pneumonia and prescribed medication for plaintiff's cough. (T. 343).

**B.      Analysis**

Plaintiff argues that the ALJ erred because the decision does not mention Listing 14.08N. The Commissioner contends that Listing 14.08N is no longer in effect.  The parallel listing is 14.08K and defendant argues, the medical evidence does not demonstrate that plaintiff meet that listing.  The ALJ did not specifically mention Listing 14.08K or 14.08N but discussed the criteria for those listings in relation to plaintiff's HIV and found:

> Although the claimant has had a longstanding history of HIV the record shows that she has had good response to anti-retroviral treatments and has been in stable condition.  The record does not reflect any bacterial infections, fungal infections, protozoan infections, viral infections, malignant neoplasms, hematologic abnormalities, neurological abnormalities, HIV wasting syndrome, cardiomyopathy, or other opportunistic infections.  There was no evidence that she had diarrhea lasting for one month or longer that was resistant to treatment.  There is similarly no evidence of marked limitations in activities of daily living, social functioning, or in her ability to complete tasks in a timely manner.

(T. 11-12); *see Diaz v. Comm'r of Soc. Sec.*, 89 F. App'x 323, 327 (3ᵈ Cir. 2004) (the ALJ did not explicitly name each listing but, "his reference to the criteria for those listings is an adequate indicator that these listings were, in fact, considered").

As noted in Parts IIB and IIC, the ALJ discussed NP Shaw's opinions:

> Judy Shaw, NP, reported that the claimant had repeated manifestations of HIV infection with documented symptoms including fatigue, weight loss, pain and night sweats.  She noted marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.  The claimant was very anxious.  She had insomnia, joint pain, depression and weight loss.  Shaw further concluded that the claimant was unable to work.  Although great weight cannot be accorded to the opinion of a nurse practitioner, the Administrative Law Judge has given careful consideration to this opinion and finds that it is not consistent with the medical evidence as a whole.  A review of the claimant's VA progress notes do not reflect allegations of difficulties in completing tasks.  As noted above, there was very little in the way of treatment records for her alleged mental impairment. (T. 14).

As previously noted, the ALJ also discussed the April 2008 opinion:

> Although Dr. Shaw described "constant" fatigue, diarrhea, insomnia and night sweats, the record shows there are occasions where the claimant did not report such symptoms, which is inconsistent with the physician's statements.   Treatment records document that the claimant's HIV was under good control and treatment.  Her CD4 count was 586.  It was also documented that her depression had improved.  She was described as very outgoing and bubbly and happy with everything she was doing in life.  In March 2007, it was noted that the claimant was doing very well.  She reported that she felt well and had gained some weight.  Therefore, the Administrative Law Judge accords little weight to this opinion as it was not well supported by the objective findings set forth in the record". (T. 14).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's conclusion that plaintiff's HIV does not meet or medically equal a listed impairment.  NP Shaw's opinion that plaintiff suffered from HIV Wasting Symptom is not supported by the objective evidence.  According to plaintiff's records, from the time she began treatment until May 2007, plaintiff's weight increased over ten pounds.  In March and June 2006, plaintiff weighed 125 pounds. (T. 262).  In July 2006, plaintiff weighed 128 pounds (T. 258) and in August 2006, she gained one pound.  In December 2006, plaintiff weighed 132.8 pounds and in March 2007,

plaintiff weighed 137 pounds.  (T. 343).  While NP Shaw noted plaintiff suffered from "anorexia" in May 2007, there is no indication in that treatment note that she was weighed during that visit and there is no prior reference in the record to anorexia.

NP Shaw also opined that plaintiff suffered from diarrhea.  During the administrative hearing, plaintiff testified that during the closed period, she suffered from diarrhea two to three times a week causing her to use the bathroom three times a day.  (T. 24). However, the treatment notes belie plaintiff's statements and NP Shaw's opinion.  In August 2006, plaintiff made complained of diarrhea to Dr. Carlyn.  However, Dr. Carlyn's records are devoid of any further mention of diarrhea beyond plaintiff's complaint.  Plaintiff did not receive any intravenous hydration, tube feeding or other prescription medication for her complaint of diarrhea and there are no other complaints in the record.  NP Shaw also stated that plaintiff suffered from night sweats on a daily basis but that claim is wholly unsupported by plaintiff's subjective complaints or treatment records.  Finally, NP Shaw opined that plaintiff suffered from insomnia due to her illness.  However, the treatment records indicate that plaintiff's insomnia was well controlled with Trazodone and further, in December 2006, NP Shaw discussed the possibility of decreasing the dosage. (T. 341).

All evidence indicates that plaintiff responded well to her HIV treatment and that her disease was well-controlled with her antiretroviral therapy.  *See Rumph v. Astrue*, 2010 WL 2976909, at *5 (S.D. Fla. 2010) (the plaintiff was in "overall good health" supporting the ALJ's decision that plaintiff did not meet Listing 14.08K).  Moreover, plaintiff's CD4 count increased steadily while she was taking her medication and she denied any side effects from her treatment.[10]

---

[10] In March 2006, plaintiff's CD4 count increased from less than 200 to 409. (T. 262).  In December 2006, plaintiff's CD4 count was 586.  (T. 340).  In January and March 2007, plaintiff's CD4 count was 454 but was still 21%. (T. 339, 342).

*See Roman*, 477 F.Supp.2d at 589 (the plaintiff's impairments did not satisfy 14.08 as her records indicated she was doing well on her regimen and her CD4 count increased).

Even assuming plaintiff meets the requirements of 14.08K, she still must demonstrate restrictions of daily activities, difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.  NP Shaw opined that plaintiff suffered from marked difficulties due to deficiencies in concentration, persistence and pace.  However, as this Court previously discussed, NP Shaw's opinions are not entitled to controlling weight and further, are unsupported by her treatment records.

Accordingly, substantial evidence supports the ALJ's conclusion at step three that plaintiff does not meet Listing 14.08K.

## IV.     Residual Functional Capacity ("RFC")

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a)**.**

Plaintiff argues that the ALJ failed to properly assess her credibility and further claims that the ALJ committed reversible error when he failed to make specific findings regarding plaintiff's RFC.[11]

### A.    Credibility

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).  If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence.  *See* SSR 96–7p, 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.  SSR 96–7p, 1996 WL 274186, at *5 (SSA 1996).

---

[11]   Plaintiff also argues that the ALJ failed to properly apply the Treating Physician rule.  However, the Court has already addressed that contention and the analysis will not be repeated herein.

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon v. Astrue*, 781 F.Supp.2d 92, 105 (N.D.N.Y. 2011) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *Howe–Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y.2007).

In this case, the ALJ determined:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment. (T. 12).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ correctly applied the standard, enumerated in 20 C.F. R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities, i.e., housework, community activities and social/physical exertions, and found that they, "are not limited to the extent one would expect, given the complaints of disability symptoms and limitations". The ALJ thoroughly discussed plaintiff's subjective complaints, including the frequency and intensity of her symptoms, including diarrhea, joint pain, depression, insomnia and anxiety and the lack of support, in the record, for those complaints. The ALJ also discussed plaintiff's treatment

including her prescription for Trazodone and the lack of any complaints regarding side effects from medication.  (T. 13).

Taken as a whole, the record supports the ALJ's determination that plaintiff was not entirely credible.  The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of pain and adequately specified the reasons for discrediting plaintiff's statements.

## B.      Function-By-Function[12]

The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1545.[13]  To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity.  20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999).  Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very

---

[12] While defendant argued that the RFC is supported by substantial evidence, the Commissioner did not address plaintiff's argument regarding the omission of a "function-by-function" assessment.

[13] The functions in paragraph (b) of sections 404.1545 and 416.945 include "certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching) ...." 20 C.F.R. §§ 404.1545(b), 416.945(b). The functions in paragraph (c) of sections 404.1545 and 416.945 include "certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting ...." 20 C.F.R. §§ 404.1545(c), 416.945(c). The functions in paragraph (d) of sections 404.1545 and 416.945 include "[s]ome medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions .... " 20 C.F.R. §§ 404.1545(d), 416.945(d); *see also Schmidt v. Astrue*, 2010 WL 3807137, at *4, n. 2 (N.D.N.Y. 2010).

heavy. *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007).  Further, the ALJ "must

discuss the [plaintiff's] ability to perform sustained work activities in an ordinary work setting on

a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work

schedule) ..., and describe the maximum amount of each work-related activity the individual can

perform ..." *Yates v. Comm'r of Soc. Sec.*, 2011 WL 705160, at *6 (N.D.N.Y. 2011) (citing SSR

96-8).

 In this Circuit, the Southern District has held that a "function-by-function" analysis is

"desirable". *Kelly v. Astrue*, 2011 WL 817507, at 8*(N.D.N.Y. 2011) (citing *Casino-Ortiz v.

Astrue*, 2007 WL 2745704, at *13 (S.D.N.Y. 2007)).  However, the Eastern, Western and

Northern Districts have remanded based upon the ALJ's failure to explicitly discuss a function by

function analysis.  *Id.* (citations omitted).

 In the case at hand, the ALJ found that plaintiff, "has the residual functional capacity to

perform the full range of sedentary work". (T. 12).  The ALJ relied upon the opinion given by

Amelita Balagtas, M.D. and concluded:

> Amelita Balagtas, M.D. reported that the claimant would have a slight
> to moderate limitations [sic] in activities that require bending, lifting,
> prolonged sitting, standing, walking, and in activities that require
> lifting, carrying, and reaching involving the right upper extremity.
> The Administrative Law Judge has given careful consideration to this
> opinion and it is reflected in the residual functional capacity cited
> above. (T. 14-15).

 The ALJ did not discuss the amount which plaintiff could lift and/or carry or the amount

of time plaintiff could walk, stand, and sit.  The ALJ merely reported his RFC finding in

conclusory fashion devoid of specifics regarding plaintiff's precise limitations.  In the decision,

the ALJ did not specifically assign weight to Dr. Balagtas' opinion, but clearly relied upon the

doctor's findings in formulating the RFC.  Dr. Balagtas examined plaintiff once and did not

provide a functional analysis.  Rather, the doctor opined that plaintiff had "slight to moderate limitations".  Thus, Dr. Balagtas' opinion failed to provide the necessary information to enable the ALJ to properly assess plaintiff's RFC.  *See Bennett v. Astrue*, 2009 WL 1035106, at * (N.D.N.Y. 2009) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (holding that consulting physicians opinion that the plaintiff's impairment was "lifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" lacked specificity and did not permit the ALJ to make the necessary inference that the plaintiff could perform the exertional requirements of sedentary work)); *but see Shatraw*, 2008 WL 4517811, at *14 (while specific findings were omitted from the RFC, the ALJ properly relied upon the consulting physicians opinion that the plaintiff could lift up to 20 pounds, stand and walk up to 6 hours a day, and sit for up to 6 hours a day as the conclusions were consistent with the definition of "light work").

Upon a review of the record, the ALJ did not sufficiently explain the basis for his RFC assessment and therefore, the Court cannot discern whether the proper legal standard was applied. *See Hodge v. Astrue*, 2009 WL 1940051, at *10 (N.D.N.Y. 2009).  The ALJ stated the RFC, assessed plaintiff's credibility and reviewed NP Shaw's and Dr. Carlyn's opinions but erroneously failed to identify any restrictions resulting from plaintiff's HIV, which the ALJ found severe.  In failing to do a function-by-function assessment, the ALJ may make the mistake warned of in SSR 96-8p. *Mardukhayev v. Comm'r of Soc. Sec.*, 2002 WL 603041, at *5 (E.D.N.Y. 2002) (internal citation omitted) (failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions.").  The Social Security Rulings are binding. *See Robins v. Astrue*, 2011 WL 2446371, at *4 (E.D.N.Y. 2011).  Thus, the case is remanded for proper

evaluation of plaintiff's RFC including a function by function analysis of plaintiff's limitations. *See Bennett*, 2009 WL 1035106, at *13.


**V.      Vocational Expert and the Medical-Vocational Guidelines**

Plaintiff argues that the ALJ erred in failing to elicit vocational expert testimony in this case, and instead relying exclusively on the Medical-Vocational Guidelines, or "grids." (Dkt. No. 14, p. 27).

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grids. *Rosa*, 168 F.3d at 78; *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986). The grids take into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy. *Rosa*, 168 F.3d at 78. Whether or not the grids should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved. *Bapp*, 802 F.2d at 605. If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. *Id*. If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06. In such cases, the ALJ may rely on the grids only as a framework for decision-making. 20 C.F.R. § 416.969a(d). Nonexertional limitations include postural limitations such as limitations in climbing, reaching, stooping, crawling, balancing, and kneeling. § 416.969a(c). As one court has explained, [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative

impairments and pain. *Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. § 404.1569(a), (c)).

As discussed, the ALJ failed to properly assess the RFC, thus the findings made at the fifth step of the sequential analysis are affected. The Court has already determined that remand is necessary for further proceedings with respect to plaintiff's functional limitations. On remand, an analysis may require the testimony of a vocational expert regarding the effect that any nonexertional impairments may have on the plaintiff's ability to perform basic work activities. *See Pronti v. Barnhart*, 339 F.Supp.2d 480, 487 (W.D.N.Y.2004).

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: December 14, 2011
       Albany, New York

Mae A. D'Agostino
U.S. District Judge